Good morning, Your Honors. Tom Christensen. I'm sorry. I just want to suggest that it's like 15 minutes would be more than adequate on this case. Okay. My name is Tom Christensen. I represent the plaintiffs Thornton, Sanson, and Kolob Plumbing. There are three reasons that I wanted to cover today as to why this Court should reverse the grant of summary judgment by District Court Judge Dawson below. And they are the notice of cancellation as a matter of law was insufficient, and that is the basis for the grant of summary judgment here. Second, there are numerous issues of fact associated, material issues of fact, associated with the cancellation notice, with the payment of premiums, with the monthly reports that were set forth in this contract between the parties, and also with regard to waiver and estoppel. It's replete with questions of fact, and I'll go over those. And then finally, I want to address the procedural irregularities in this situation that require the Court to reverse the District Court. First of all, with regard to the cancellation as a matter of law being insufficient, and I want to use my opponent's brief, because there's been some allegations that I shouldn't be allowed to argue the law that applies to whether this cancellation is legally sufficient, because it wasn't in my opposition, because my opposition mainly dealt with the waiver and estoppel arguments. But this issue is required for the Court to decide, the District Court, in order to grant summary judgment, because the Court has to decide that notice was given, that it was legally sufficient, in order to have a cancellation. Going from his brief, page 15, he quotes NRS 687B.320, the statute with regard to cancellation notices. And it says that no cancellation under subsection 1 is effective unless, effective until, in the case of a paragraph A of subsection 1, at least 10 days. And in the case of any other paragraph of subsection 1, at least 30 days. Paragraph A of subsection 1 is nonpayment of premium, cancellation for nonpayment of premium. And any other reason that you give for canceling a policy, you have to give 30 days' notice. They admit to only giving 10 days' notice. Also, in the policy, which is at page 16, the same situation is there. 10 days if it's for cancellation because of nonpayment of premiums. 30 days if it's for any other reason. Then we get to their cancellation notice. And it says they've only given 10 days, number 1. And the reason given for cancelling the policy is nonpayment of premium and or nonsubmittal of monthly reports. They're the same thing, aren't they? No. They are not the same thing. How is the premium calculated? From the month — some of the premium is calculated from the monthly reports. Some of it is a fixed amount. How could your client know what to pay in a given month without doing that calculation? That's right. That's what they had to receive, the monthly reports. Is the answer to my question they could not? They could — they could calculate it themselves. They don't need the monthly report to calculate it. But the method of doing business and, in fact, the insurance company represented the policy clearly called for, at least in part, premiums to be based upon, what was it, gross receipts? Right. And it required some calculations. Correct. And that's what's referred to. It's part and parcel of the premium, isn't it? I don't think so, because — Tell me how it's not. Well, because it's part of complying with the insurance contract more so than part of paying the premium. Because the reason in the statute for 10 days on nonpayment of premium and 30 days for other problems with the relationship Let's suppose in a hypothetical circumstance that a portion of a premium was dependent upon the number of employees that the insured had at a given point in a given month. Okay? This is a hypothetical question. Okay. And if it's 10 or less, the premium is A. If it's 10 or more, the premium is B. Tell me how that would not be part of premium payment if the insured in a given month either refused or declined or neglected to provide the number of employees they had. Well, as in this case, the premiums paid far exceed the premiums due, even up to — Is this the payment made after the accident? No. This is including the initial payment made in June, like June 15th, that then the insurance company billed them for on the 24th. That was the very first monthly report that came out, which was inaccurate, prepared by the insurance company, charged them for $3,000-some-odd that they already paid. And if they had just paid that report, you know, paid the numbers that were on that report without conversing with the insurance company, figuring out what was really They would have double-paid that some $4,000. So going fast-forward. Did they pay the January payment timely? They had sufficient — and if you look in my brief, the chart, there is sufficient payments of premiums to take that policy clear through the end of May, actually. In my report, if you look at it — Aren't you answering two different questions? One is, what you're saying is there was already enough money in there to pay the premium. I think Judge Hawkins' question was, did you pay the specific premium on the date, which I think the answer is no, right? Well, that's correct. That — There was no premium paid that had — this is January's premium that was paid before February, April 12th. But, you know, if you look at my client's deposition transcript — Well, and again — Let me summarize to make sure I understand your position. Okay. You are conceding you didn't pay the premium when due, and you say it doesn't matter. And there's a factual question because we had overpaid prior premiums. Is that what your position is? That's correct. And not only that, but it's a factual question because we concede that there was never a payment that said January paid, you know, that we can point to in the evidence. But our understanding was, and it's because of the way this monthly reporting was done by insurance — by the insurance company, starting with the very first monthly report that was $3,000 off in their favor. But because of that, my client, in his deposition transcript, attached to this by my opponent — this is their supplemental thing, number 65. At page 122, he's asking about the January payment, and he asks the question, let me ask you this, do you believe that as of April 12th, 2000, the date of the check-in are that you were — you had paid January 2000's premium? Answer, I felt like I was totally current with that check. And that's the problem with their notice. And the reason — I said the problem with the notice. Their cancellation notice? I understand your defense, but they say you didn't pay the premium, and that's true. No. You say we overpaid a prior premium, but you didn't pay it. Let me give you an example. Let me — because let's take — let's say monthly mortgage, you know, one of our common things. Just because you prepay or overpay, you know, in a prior month doesn't necessarily mean that they're excused from making the monthly payments. And that's their argument. Your argument is we overpaid, and there was a deposit and whatever, and we got plenty of money, and you shouldn't cancel this. I don't know if that has anything to do with the notification on that. You're saying the notification isn't valid as a matter of law, but you're defending it by saying we had actually paid it. And I don't see that as a legal issue. I see it as a factual issue, perhaps, at best. Am I wrong? And that's true in either way. If it's a factual issue, we win because there's issues of fact that happened in the government and summary judgment was improper. I understand that. And they're going to — I know they'll respond with a factual question. But your — where you started off on this argument was to say this notice was defective as a matter of law. That's correct. And I don't understand that argument. Well, and that's — Because you're saying, as a matter of fact, we'd already paid, but that doesn't mean a notice is defective. No. The notice is defective as a matter of law because I think it is different to say nonpayment of premium or no monthly reports. And or. And or. So at least it's valid as to the first part. Well, yeah. Then you go to — That's a 10-day notice, right? Well, except then you go to Nevada law, which says if an insurance contract is ambiguous, then the ambiguity is construed against the insurance company. But what's ambiguous about saying you are late because of — you paid — you didn't pay your premium and you didn't pay your monthly — you didn't give us the monthly reports. That's — And it may, as a matter of law, mean that 10 days applies to one and 30 days applies to the other. But I don't see how you can construe to say that the 10-day notice isn't effective as to the first reason. Okay. It's ambiguous because — Why is it ambiguous? You don't know whether it's nonpayment of premium or I didn't submit my monthly report. It says and or. What does and or mean to you? Or. And. It could be both. It could be neither. I mean, it could be one or the other. But if it's — And wouldn't a reasonable insured in your position say, look, I didn't pay my premium and I didn't give the monthly reports? That's what they're saying I did wrong. And that's exactly what he did in a reasonable point of view. So what's — And what happens is that gets construed against the insurance company. So because if it's I didn't do my monthly report on time, then they don't get to give only a 10-day notice because it takes longer than 10 days to straighten that out. Right. But I don't see how it excuses. I don't see how you can possibly say that the nonpayment of premium is excused by the by the addition of an additional reason in the notification. I mean, insurance companies are not — they don't waive the notice on nonpayment of premium by listing a host of other sins that they think the insured has committed, do they? But they do make — We think — we're giving you a notice as to 15 different things. You didn't file your comp reports. You didn't do this. You didn't do that. You're supposed to give us other things. And you didn't do any of those. But if they say nonpayment of premium, doesn't that — why is that — why is the addition of the — why is the addition of the other factors? Why does that — Because it makes it ambiguous, and then the insurer doesn't know what they're supposed to do to keep their policy in effect. And in this case, the insurer did what he thought he was supposed to do, and it wasn't enough. But, you know, that was because the insurance company doesn't want it to be enough. But then we get to all the — and I see my time is running fast. Let me quickly go through the issues of fact. Was a premium due? We already went through that issue, that there's a lot of — you know, in our thing, you can — our chart, you can see $11,000 worth of premiums were collected by insurance company, and only $10,600 are owed in the — at the end of the day. There should have been a refund to my clients of premiums in this case. And that was never done. That's a question of fact. They couldn't do a cancellation for non-payment of premium if the premiums are all paid. No January report was sent to them, and the insured testified that he thought it was all paid in advance. And so that raises at least an issue of fact as to whether there was an amount of premium still owing when the notice was sent. Was a report not sent back? That is a question of fact. If you're taking the either-or approach here, and that that can be a reason for them to — for this cancellation notice to be valid, there isn't a report that wasn't sent back. There was no report sent for January. And finally, there's reasonable confusion on the premiums as a result of this course of dealing. You know, I started with the very first report, June, that had an improperly billed $3,000 amount. And throughout the reports, if you look at the different reports that were filed, it's a continuing course of conduct between these people to cross out and interlineate. And that has always been accepted all the way through. And then now it's not accepted. And that's the waiver and estoppel issue. And then just very quickly, the Federal rules are important. And it's not appropriate to have strict compliance for one party and loose compliance for a rich or more powerful party, because the Federal rules — and this may seem like a little picky thing, but if the Federal rules are not enforced across the board evenly, you end up with a separate set of rules for one group, and it's important, actually, to that group, the rich and powerful, to have the rules enforced, because that's what keeps them in power. Thanks. Good morning, Your Honors. My name is Jim Silvestri. I'm here on behalf of Insurance Company of New York. It — at the onset, sort of keying off what your opponent argued, it is a bit anomalous that in a case where the insurance company is insisting upon and enforcing strict compliance with its premium and notice and payment provisions, that it sought and obtained a lack of precise compliance with the Federal rules of civil procedure and local rules for the filing of the motion that granted them relief. Do you want to comment on that? Sure, Your Honor. The filing of the motion was four days late. I guess if you want to — Didn't the court's order say this is the deadline — It did. It's the deadline, and we won't extend the deadline. And if the premium had been paid four days late and — well — The premium was paid much later than four days late. Yeah, I know. But late is — I'm just saying if it had been paid four days late — Two different issues, and I accept the responsibility. I filed the motion four days late. The court made the decision to hear the motion for summary judgment. I certainly was not going to, on behalf of my client, tell the court not to hear the motion for summary judgment or rule on it. At the time of the joint pretrial conference — or, excuse me, the pretrial hearing attended by Mr. Christensen and myself, Judge Dawson indicated that he wanted to hear the motion for summary judgment. We returned to court approximately five days after that hearing and had oral argument. The issue, I think, needs to also, though, be looked at with respect to whether  the circumstances surrounding the filing — the late filing of the motion for summary judgment, all which I believe favor the court's hearing and ruling on the motion for summary judgment. First of all, we had some depositions that were taken in June of 2003. Those depositions primarily of representatives from an independent contractor, HDR, previously named defendant but stipulated — or dismissed by stipulation with prejudice, was done really at the request of plaintiff's counsel, not Mr. Christensen, somebody formerly in his office, who had not noticed these. And we agreed to do them in June by stipulation. We didn't get deposition transcripts back until July. Same thing with one of their primary witnesses, Kelly Keene, who they controlled. We didn't know where she was. They finally located her in Arizona and agreed to bring her to Las Vegas late in June. We took her deposition. So there were some factors there. The motion was only filed four days late. The hearing wasn't for four months after the motion was filed. Certainly, there was ample opportunity for both parties to fully brief the issues, to fully discern what evidence needed to be presented before the Court. Roberts. Let's turn to the merits. Yes, Your Honor. Is it correct that at the time the carrier was contending that the January premium had not been paid, that the company had actually overpaid its premiums? That is not correct, Your Honor. Tell us why. It's incorrect for a couple of reasons. First of all, I want to begin with the chart that Mr. Christensen refers to that's in his brief. He talks about an amount of money that was overpaid. I believe, though, that he miscalculates because the last check that he refers to, which is a check of approximately $2,900, that was the check that was sent on May 12, 2000, May 12, 2000, which is two days after the motor vehicle accident in question. That check was returned. The second point. So what you're saying is that to reach the number that he contends amounted to an overpayment, you have to include the post-accident payment? I believe so. Okay. The second point that I want to make is that the $3,000 in change that is referred to by Mr. Christensen was a deposit that is required under the policy, and that's clearly delineated in the policy agreement. Is that part of a premium? That is not a premium payment. That is a deposit that is made. These types of policies allow for an accounting process to take place at the conclusion of the policy period. They can go back in, do an accounting, and make certain that there weren't more vehicles on the policy than had originally been told to the insurer, that the revenues were correct, and this is a fairly common practice. And if premiums are owed, then you take it from the deposit, right? I'm sorry, Your Honor? If premiums are owed at the end of the policy period, you take it out of the deposit, right? If there is additional premium owed, that could happen. In this particular case, there has not been any evidence delineated showing that there was any overpayment. If there are no further questions, I'd like to just direct a couple of comments on the — first of all, with the sufficiency of the notice. And it is true, Your Honor, Judge Hawkins, you pointed out very clearly that the payment of premium goes hand-in-hand with the monthly report. And without the monthly report, there's no way that the insurance carrier knows whether there's an accurate premium being paid or not. So — But I think that if the notice had simply said, failure to give the monthly report, that would have been subject to the 30-day cure period. Right. It possibly could have. But it's clear in this case, and it's clear that the plaintiff understood that this was failure to pay premium, because this had been a problem that had happened at least two or three times before the final notice of cancellation was sent out. And it's very clear that the January premium was not paid, because when the February premium check was sent in, it — the check specifically delineates it is for February 2000 only. And, in fact, somebody with a colob crossed out the January payment. We don't know why. We asked them why in their deposition. They couldn't tell us why they crossed that out. But they did fail to pay the January premium. And, in fact, that's admitted to. And, in fact, it's not only admitted in the record, but when you — excuse me, through discovery, but when you look at the final check that was sent in May 2000, which is two days following the motor vehicle accident for which they're seeking coverage, they specifically delineate on the check that they are paying January, March, and April premiums. So they had full knowledge, and it's fairly clear that they did not pay the January premium prior to the cancellation date of April 15, 2000. I don't know if Your Honors wish me to address any further issues on waiver and estoppel. There are issues that were raised in an appellant's brief. For example, they argue that we waive our rights or are stopped from disclaiming coverage in this case because we allegedly adjusted a claim of another motor vehicle accident that occurred on or about April 15, 2000. And I don't know if you need questions answered on that issue or not, but very briefly, a Nevada statute clearly allows an insurance carrier to investigate claims without waiving any rights on the issue of coverage. So, and that's in 687 NRS 687B. Did you send a reservation of rights letter on that claim? We did not, Your Honor. And, in fact, the testimony that came out from the adjuster that handled that claim was that she attempted to contact the insured primarily because we weren't certain that an accident or a claim had occurred on April 15. There was no accident report. There was no statement from any witnesses. The only notice that came forth regarding that was what we call an accord form, which the agent had submitted, and it listed an accident date of April 15. For example, had the adjuster contacted or been able to talk to somebody at COLAB, and they were told, no, the accident was on April 14, that would have been a covered claim because the cancellation was effective April 15. But in this particular case, we weren't able to make contact with them. It was finally determined that the accident must have happened on April 15, and the claim was denied. I take it that you did not participate in the settlement of the underlying case. Is that right, your company? At what time? Well, ever. That's not accurate, Your Honor, but it's not a part of this record. Yeah, I understand that. I'm happy to explain that if you would like. No, but I take it that you may have initially become involved, but at least when the case,  you did not actively participate in the litigation of the matter. Is that true? They did not. Okay. Well, I want to be accurate about that, too. Following the entry of the motion for summary judgment, I received calls from the two attorneys that represented the plaintiffs in the underlying court claim. And so there were discussions following the motion for summary judgment that I personally was involved in. And was there any other? Well, I'll ask your counsel, the opposing counsel, then. If there are no other questions, the only thing else I would add is that, and I do take exception to some of the comments made in Appellant's brief, that we relied on evidence that had not been authenticated or was not admissible. When we went through the ---- I wouldn't be worried about that. Thank you, Your Honor. If there are no further questions, thank you. Mr. Butler. Just briefly, a little bit with the procedural aspect of this situation. It was a calendar call after a settlement conference Monday morning for a trial to start the next Monday, a week later. And when the issue of I'm going to decide their motion for summary judgment came up, and the ---- How were you prejudiced, though? Well, because I came down for calendar call and was told, are you ready to argue this motion? And I said, no. I'm kind of shocked that you're going to now consider it. And the Court gave us two days. It wasn't five days later. It was two days later while I'm in the process of preparing a case for trial, Your Honor. So it's kind of ----  Excuse me? You briefed the motion? Well, I actually hadn't briefed it. I was a prior attorney in my office. But then in that same situation, Your Honor, the Court requested that they supplement the record with a copy of the insurance policy and allowed them to submit case authority to the Court, and then decides the case and ignores my oral argument about the sufficiency of the notice. And I just think that's improper. Just for my own edification, is this a case where you've settled it by assigning the insurance rights to the plaintiffs, or? No. OK. Does Nevada recognize third-party bad faith tort liability? Not third-party, no. OK. They would have to come about it through the insurance. But there has been no assignment. And there is still outstanding judgments, to my knowledge. No? Well, that's good news. But news to me. Well, the reason I ask is because, you know, really, none of you would be here except for the fact that there was a major accident. And if there's some way to resolve this dispute outside here, then our circuit mediators can sometimes be of assistance in that if there are some, shall we say, some methods of bringing all the parties, including the ones who aren't here, before the Court. Yeah. We'd be happy to participate in something like that. One other thing. On page 32 of my brief, because it's totally inaccurate what counsel for the insurance company has said about the calculation of premiums paid, the totals at the bottom of the page, money due, and that goes through April of 2000, is $10,639. Money received is $14,557. That includes that $2,900 check paid on May 12th. But the money retained as of that time is $11,587.70. So that figure is still enough to cover a May payment, but none was calculated. Because it's $1,000 or $900 more than the premiums that it accrued up through April. And that's money retained. That's money they actually had in their possession. And by the policy, if that was extra money more than what they, if they claim they canceled this policy April 15th, then they should have returned to the insured a little over $1,000 of those funds. Mr. Silvestri, so what is the status as those matters involving the injured party? There were some deaths here, weren't there? There were, Your Honor. Following motion for the, it was not part of the record, so I didn't include it, but following motions for summary judgment, attorneys Rob Murdoch and Montaner, those were the two attorneys representing the various plaintiffs in that case, contacted me. We made a disputed settlement, disputed offer to them, and those claims have been settled and satisfactions of judgment have been filed within that underlying tort case. When did that happen? Because my clients, since the motion for summary judgment, my clients have been subpoenaed to examination of judgment debtors and things like that with Montaner, and is that what the goal is? This is not, we were just asking for information about the resolution of that. You guys can work this out. Right, and they have both been resolved, Your Honor. I have satisfaction. The judgment is satisfied against, I mean, not only have you got, have you received a covenant not to sue the insurance company, but the judgments have been satisfied in favor of the company here? Satisfactions, name everybody. Okay. So really that moots out everything except the premium and the insurance. It sounds like we don't have much to decide here, but that's up to you, I guess. That's not even a jurisdictional amount for us, you know.  And it never came up. But why are we here? Well, they're seeking. I'm a little concerned, Your Honor, because that is not the information I have. No, but it's the same as the stipulation dismissing, and it's kind of unusual to be blindsided in this way at this time, and it concerns me. Well, yes, but leaving that out, yes, leaving it out, if it's a good resolution for it, true. And that doesn't mean we won't – I was just asking for purposes of determining whether mediation was appropriate. It has no effect on our decision. Okay. On the other hand, I'm doubtful now whether we have jurisdiction, because I'm not sure the amount in dispute exceeds our jurisdictional limits, but that's another question, I guess. Well, the other aspect of that is my client is in bankruptcy as a result of this situation, and so that – there are a lot of damages that flowed from the inaction and the slow action on the part of the insurance company. Part of your complaints for them. Sure it is. No, it's not. Your bankruptcy is not raised, and the complaint is a damage. Well, I've raised – I just read your complaint. The words bankruptcy aren't in there, unless I've – Well, the bankruptcy just happened, you know, actually since the filing of this appeal. Is it a reorganization, or is it a chaplaincy? No, it's a liquidation. So did you get permission of the trustees to maintain this act? Yes. Yes, I did. Okay. Okay. Okay. Okay. Okay.
judges: Pregerson, Hawkins, Thomas